IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **4:18CR3143** |
| vs. | |
| FREDERICK ALAN VOIGHT, | **ORDER** |
| Defendant. | |

This matter is before the court on the Petition and Second Petition alleging violations of Defendant's Pretrial Release. (Filing Nos. 193 & 202).

The Petition alleges the defendant violated condition (h) of the Order Setting Conditions of Release, (Filing No. 15). Condition (h) requires the defendant to "[a]void all contact, directly or indirectly, with any persons, who are or who may become a victim or potential witness in the subject investigation or prosecution." (Filing No. 15, at CM/ECF p. 2). The Petition alleges the defendant violated this condition by having contact with and receiving payments from RevH2O while on pretrial supervision, and that his work for Thompson, Hunt and Associates (THA) involves indirect contact with a victim of the instant offense; R.M., who serves as a director, secretary and shareholder of said company. (Filing No. 193). The Second Petition alleges Voight violated condition (t), which states the defendant "is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the supervising officer" in that he secured "substantial financial loan(s) for the payment of attorney fees from Thompson Hunt & Associates without the prior approval of his supervising officer." (Filing No. 202).

The defendant denied the allegations. An evidentiary hearing was held. Having observed the witnesses as they testified, reviewed the docket filings, and

considered the exhibits offered at the hearing, the undersigned magistrate judge finds as follows.

ANALYSIS

A person who has been released on conditions, and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court. 18 U.S.C.A. § 3148 (a). The court must enter an order of revocation and detention if, after a hearing, the judge finds, by clear and convincing evidence that the person has violated any condition of release; and that either 1) there no conditions or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or 2) the person is unlikely to abide by any condition or combination of conditions of release. 18 U.S.C.A. § 3148 (b)(2); United States v. Welsand, 993 F.2d 1366, 1367 (8th Cir. 1993). Under this statutory scheme, the court must decide whether the defendant violated conditions of his pretrial release, and if so, whether the defendant can be adequately supervised while subject to release conditions to reasonably avoid risk of harm to the public, obstruction of justice, or nonappearance at court proceedings.

The indictment alleges Voight solicited investors to invest in companies that had an excellent and innovative product in a growing market but lacked sufficient funds to market their product. As relevant to the pending allegations, the indictment alleges Voight personally, and on behalf of the several entities he has formed as listed in the indictment, solicited and received funds for investment in RevH2O, LLC (RevH2O), but he did not invest any or all the funds in that company. (Filing No. 1, Counts 6-13, 17).

2

Voight was aware that David Kailbourne was the CEO for RevH2O. Prior to the indictment, three subscription agreements were signed by Voight as an officer of F A Voight & Associates, LP (FAVA) and by Kailbourne as CEO of RevH2O. (Exs. 8A, 8B, and 8C). In July 2021, after the indictment was filed and while subject to the court-imposed conditions of release, Voight, as General Partner of FAVA, communicated with RevH2O regarding a RevH2O unit repurchase. (Ex. 8E). RevH2O and FAVA entered into a contract whereby RevH2O paid $200,000 to buy units of RevH2O owned by FAVA. (Ex. 8F). Voight never notified Pretrial Services of his communications with RevH2O— either before or after it occurred.

Condition (h) of Defendant's conditions of release requires the defendant to "[a]void all contact, directly or indirectly, with any persons, who are or who may become a victim or potential witness in the subject investigation or prosecution." Defendant claims he did not knowingly violate this condition. This argument fails. First, condition (h) applies to not only known but potential witnesses. RevH2O was named in the indictment as a company for which Voight collected investment funds that were not received by RevH2O. Based on the indictment alone, Voight was clearly placed on notice that RevH2O was a potential witness in this case and since it did not receive investment money intended for its use, it was a victim of the alleged crimes. In addition, Voight was permitted to possess and review all of the government's Rule 16 disclosure information. I find Voight's claimed ignorance that communications with RevH2O were prohibited is neither plausible nor credible. I further find by clear and convincing evidence that Voight violated condition (h) of his release conditions.

Prior to the indictment, Voight, personally and as president of Lenape Holding, LLC, signed promissory notes for receipts of investments funds ($25,000, $75,000, and $541,67 (Ex. 9A, 9B, and 9C)) provided by Rita Mousa.

3

In addition, Topside Partners, L.P., one of Voight's entities (see Filing No. 1, ¶ 1), sold shares of InterCore, Inc. to Rita Mousa. (Exs. 9D, 9E, 9F, 9G). Rita Mousa had also invested $3.5M in Thompson Hunt & Associates (THA), and at the time of Voight's indictment, she was and remains a director, shareholder, and either a treasurer or secretary of THA from 2017 to the present. (Exs. 10A, 10B, 10C, 10D, 10E, 101). THA is the sole member of GMTH Holdings, LLC., and GMTH Holdings is the sponsor of the SEC-registered GNMAG Bond. (Exs. 10E1, p.2; Ex. 12A, p.2).

For the last five years, Christopher Vaughan has been the President and CEO of THA. He states he has worked 5 to 7 hours a day for THA, but he was never paid for his work because THA has not sold anything, including GNMAG bonds. (Ex. 12A, pp. 1-2). In 2018, Voight began working two to four hours a day for THA. Although he was required to submit monthly reports of his employment to pretrial services, Voight did not to report his work for THA, (Ex. 6), and through his counsel, Voight argues it was not employment since he, like Vaughan, was never paid. (Ex. 12A, p. 2). That said, in August of 2019, Voight moved to modify the conditions of his release to allow him to travel outside of Texas for work, explaining he "has had difficulty finding employment with the pending charges." (Filing No. 68).

In March of 2022, Voight retained new counsel and with that change, requested another continuance of his trial. (Ex. 12C; Filing No. 151). The court was surprised when new counsel entered an appearance—Voight's previous counsel had stated Voight was unable to pay experts or his trial counsel due to lack of funds, and there was nothing in the pretrial services entries to explain Voight's sudden cash flow. But Voight's brief in support of his motion to continue explained that Voight was previously unable to hire counsel of his choice because a prior Asset Freeze Order, and that order "limited Mr. Voight to

4

withdrawals totaling not more than $20,000 per month from his business and employment earnings to support himself and his family and to pay for 'legal fees and other professional services on his behalf.' "[1] (Filing No. 152, at CM/ECF p. 2). (See also, Filing No. 179, at CM/ECF pp. 6-7). With that order now lifted, the brief stated, Voight could pay for new attorneys. (Id.)

The brief was misleading at best. During the hearing on Defendant's motion to continue, Voight explained that his recent access to funds for payment of counsel was not due to lifting the Asset Freeze Order—Voight is not paying for his attorneys. Instead, THA is directly paying for Voight's new counsel and his trial experts. As reflected in the express language of their retainer letter, Voight's new attorneys receive payment directly from THA to "avoid the risk that funds held in a security retainer might be seized." (Ex. 12C, p. 2 (labelled as page 3 on the document itself)). Due to this risk of seizure, Voight's current counsel was not willing to represent Voight if the funds were coming from Voight's accounts rather than THA. (Id.) And THA was not willing to pay Voight's legal fees for his previous counsel.

There are no documents explaining what the payments made by THA on Voight's behalf are for; as of now, they are not construed as compensation for Voight's past and ongoing work product. THA suggested this characterization, but Voight refused. However, THA may later decide the payments were compensation for Voight's work and if it does, it will then issue 1099s to Voight. Vaughan believes the payments to Voight's counsel could be construed as advances on future THA earnings or as a loan to Voight. Currently, Vaughan is

---

[1] On July 22, 2021, a judgment was entered against Voight and in favor of the Securities and Exchange Commission in amounts totaling more than $20M. Sec. & Exch. Comm'n v. Voight, No. CV H-15-2218, Filing No. 128, (July 22, 2021). That judgment has been appealed, but based on the court's docket, no supersedeas bond has been filed. See Sec. & Exch. Comm'n v. Voight, No. CV H-15-2218, Filing No. 129.

construing the payments as a loan that THA may later choose to forgive, in whole or in part, by reconstruing the attorney fee payments as compensation for work performed by Voight. (See Ex. 12A at 4).[2]

Vaughan states Mousa's $3.5M investment in THA was spent before Voight was indicted. Vaughan further states that Mousa knows Voight is performing work for THA. But although she is a director, shareholder, and either treasurer (2017-2021) or secretary (2022) for THA, she does not know THA is paying for Voight's legal defense.[3] She was not told because if she knew, she would strongly object. (Ex. 12A, p. 4 ("She would fly here and kill me.")).

Investments in THA have totaled $15 million dollars; $3.5 M from Mousa, $8 M from Michael Cohen (Chairman of the Board of Directors of THA, and the individual who recruited Voight's services), and $3.5 M from other investors who the government has not yet identified. The funds from Mousa and Cohen are not being used to pay Voight's legal defense. Only the funds from the unknown investors are being used for that purpose, and those investors have not been told that they are paying for Voight's lawyers and experts. (Ex. 12A, p. 4).

In the end, it does not matter how THA characterizes its payments toward Voight's legal defense. The court finds, by clear and convincing evidence, that Voight knew he was being compensated, even if indirectly, for work performed for THA and he either concealed this information in pretrial services reporting, or he received a loan and continues to accrue additional charges without the prior authorization from pretrial services required under condition (t) of the order

---

[2] After being interviewed by the government's agent, Vaughan provided the defendant with an affidavit stating "THA does not expect Mr. Voight to pay back that money." Ex. 103, ¶5.

[3] Mousa was no longer a treasurer for THA when its payment of Voight's legal expenses began. Mousa switched from treasurer to secretary in THA's 2022 annual report, and that report does not identify anyone currently serving as THA's treasurer.

setting the terms of his conditions of release. For several years, Voight has not been candid with pretrial services or this court regarding his employment and more recently, his compensation for that work. And THA has not been candid with its board members (i.e., Mousa) and outside investors on how the company's investment assets are being spent.

The defendant, through his counsel, argues he did not understand his conditions of release. That argument is not credible. Before entering the order, the court reviewed each condition with the defendant. The defendant agreed, under oath, to comply with each condition. He signed the order setting conditions of release and received a copy of it before he left the courtroom. And after the defendant arrived in Texas, his supervising officer again reviewed the conditions with the defendant. (Ex. 7, p. 44 (11/26/2018 entry)). The language of Defendant's conditions of release is consistent with the national format for federal conditions of release, written in plain English and readily understood by the wide variety of defendants appearing in federal court. A defendant who, like Voight, has substantial experience in drafting and reading contracts and complex documents cannot credibly state he did not understand the conditions of release.

Having concluded the defendant violated the conditions of his release, the court will now consider whether any conditions of release and supervision this court can reasonably provide will sufficiently address the concerns with Voight's witness contact, lack of candor, and violation of release conditions. Voight is a highly sophisticated defendant—so much so that he provides a service to THA that few others can provide. As such, it has taken several weeks for the court's pretrial services office to investigate and unravel the web of information described above. After speaking with not only the Voight's pretrial services officer, but a supervisory pretrial officer who teaches nationally and has been a

7

pretrial services officer for more than two decades, I have concluded the court cannot craft and impose any conditions amenable to adequate court supervision.

Voight has suggested several conditions which could be imposed. (Filing No. 208, at CM/ECF pp. 7-9.) But each of these proposed conditions would require the court to trust Voight going forward. For example, even if pretrial services demanded financial disclosures, based on the past history of this case, the court does not believe those disclosures would be full, complete, and truthful. And absent watching Voight's daily activities and his keystrokes as he works, there is no feasible way to monitor Voight's communications by computer, phone, and other internet- or cellular-connected devices.

Voight's current counsel claims any past violations of the pretrial release conditions will not reoccur since he is no longer represented by his prior counsel and his current counsel will more closely supervise Voight's conduct. For several reasons, the court cannot rely on this representation as sufficiently ameliorating the risk of obstruction of justice and of harm to others that will occur if Voight remains on release. To begin, Voight's new counsel does not understand the concern arising from Voight's undisclosed contact with RevH2O, arguing it did not violate Voight's conditions of release. (Ex. 8G, p. 4). Counsel's inability to accept that fact that Voight clearly contacted a potential witness raises serious concerns with counsel's ability and willingness to supervise Voight's behavior. And if Voight did violate the release conditions going forward, his attorneys would face ethical barriers when deciding whether to notify the court of their client's conduct. Finally, Voight's counsel cannot—and should not be required to—monitor and control Voight's compliance with release conditions. Placing counsel in that position could make them witnesses at trial, and it would make them witnesses at any future pretrial release revocation hearing. Moreover, Voight's current attorneys are from New York and Chicago; Voight is from Texas, and all

8

of Voight's communications and conduct giving rise to the Petitions occurred by internet from the privacy of Voight's home or location. Ex. 102, ¶ 7.

I therefore conclude the defendant is unlikely to abide by any condition or combination of conditions of release, and he cannot be adequately supervised to assure compliance with the court's order setting conditions of release.

Accordingly,

IT IS ORDERED:

1) Defendant's release on conditions is revoked.

2) The defendant is committed to the custody of the Attorney General or a designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or held in custody pending appeal. The defendant must be afforded a reasonable opportunity to consult privately with defense counsel. On order of the United States Court or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to the United States marshal for a court appearance.

Dated this 29th day of June, 2022.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

9